**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE ENERGY SERVICE, INC., *et al.*,[1] | ) | Case No. 26-90295 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF GUY SIRKES, EXECUTIVE**
**VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF NINE ENERGY**
**SERVICE, INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Guy Sirkes, Executive Vice President and Chief Financial Officer of Nine Energy Service, Inc., a publicly traded company incorporated under the laws of Delaware ("<u>Nine Energy Service</u>," and together with its debtor affiliates, collectively, the "<u>Debtors</u>," and with their non-debtor subsidiaries, "<u>Nine</u>" or the "<u>Company</u>"), hereby declare under penalty of perjury:[2]

**<u>Introduction</u>**

1.    Nine Energy Service is a publicly traded company listed on the New York Stock Exchange (the "<u>NYSE</u>") under the symbol "NINE."  Along with its subsidiaries, Nine is an oilfield services ("<u>OFS</u>") business that supplies cutting edge solutions for unconventional oil and gas resource extraction and development across North America and abroad.  The Company partners with exploration and production ("<u>E&P</u>") customers to design and deploy downhole solutions and technology to prepare horizontal, multistage wells for production.  Through its asset-light business

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/NineEnergy.  The location of Nine Energy Service, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 2001 Kirby Drive, Suite 200, Houston, TX 77019.

[2]    Capitalized terms used but not defined in the Introduction shall have the meaning ascribed to them in this Declaration.

model, advanced technological offerings, diversified business lines, and highly experienced management team, Nine provides customers with cost-effective and comprehensive completion solutions designed to maximize production levels and operating efficiencies. Nine's culture is driven by an intense focus on performance and wellsite execution as well as a commitment to forward-leaning technologies that aid the development of smarter, customized applications that drive efficiencies and reduced emissions for clients.

2.      Headquartered in Houston, Texas, Nine employs approximately 1,100 full-time employees and engages approximately 30 independent contractors. Over a decade of organic growth and targeted acquisitions have brought Nine to where it is today, with an operational reach that extends across all major onshore basins in the United States and Canada, as well as abroad, with a research and development ("R&D") facility in Norway to help serve the international markets. Nine's customer-focused approach has solidified its place in the industry as a trusted partner.



3.      Despite the Company's positive gross profit generation, a confluence of factors contributed to Nine's present need to comprehensively restructure its balance sheet. **First**, an overleveraged capital structure created high interest expense costs for the Company over

the past several years, which limited Nine's ability to achieve levered free cash flow and reinvest in its businesses.  **Second**, the oil and gas industry continues to experience challenging macroeconomic conditions, as major oil indexes suffer persistent pricing declines, leading many E&P companies to reduce their drilling and completion programs.  Nine's financial success is highly predicated on active drilling rigs and fracturing fleets.  The Company's management team estimates, out of an abundance of caution, that these conditions will persist through 2026, which will continue to put pressure on the Company's gross margins.  **Finally**, OFS companies rely on consolidation through merger activity to scale to relevance with both investors and customers, especially as their E&P customers similarly consolidate.  For Nine, these growth opportunities remain largely closed off today due to its leverage profile, annualized debt interest expense, and near-term debt maturities.

4.      The combination of macroeconomic and industry-specific challenges limits the Company's optionality going forward.  As Nine falls behind, competitors able to scale through organic growth and acquisition threaten to capture more of the total addressable market. And without the ability to unlock additional liquidity or deleverage, the Company lacks the resources to meaningfully invest in its people, R&D, and assets to maintain a leading technological position in the industry.  These headwinds caused consistent declines in the Company's share price over the last few years, which recently triggered non-compliance with the listing standards of the NYSE.

5.      Understanding that its leverage profile constrained its ability to address issues within its control, Nine engaged restructuring advisors in late 2025 to explore strategic and financial alternatives aimed at refinancing or restructuring its debt obligations with minimal disruption to its business operations.  The Company, with the assistance of its advisors, thoroughly

evaluated all available options, including out-of-court refinancing opportunities.  But in the face of continued industry headwinds and a declining stock price, the Company determined that an in-court restructuring providing for the complete equitization of its Senior Secured Notes would best allow it to substantially deleverage its capital structure and position it for long-term success.

6.     In November 2025, the Company and its advisors engaged an ad hoc group of holders of the Company's Senior Secured Notes (the "Ad Hoc Group"), who had organized with Milbank LLP as counsel and Houlihan Lokey Capital, Inc. as financial advisor (collectively, the "Ad Hoc Group Advisors").  The Company submitted a non-binding proposal to the restricted members of the Ad Hoc Group for a comprehensive deleveraging transaction to be effectuated through a quick, prepackaged chapter 11 plan.  In parallel, the Company engaged with the Prepetition ABL Lenders on the terms of a financing package to fund both a chapter 11 process and the reorganized Nine's go-forward operations.  Following months of hard-fought, arm's-length negotiations, the Debtors, the Prepetition ABL Lenders, and members of the Ad Hoc Group holding more than 70% of the claims arising under the Senior Secured Notes (the "Consenting Noteholders") entered into a restructuring support agreement attached hereto as **Exhibit B** (the "RSA").

7.     Nine commences these prepackaged chapter 11 cases to effectuate the carefully negotiated and comprehensive balance sheet restructuring embodied by the RSA, which will ensure its long-term viability.  Pursuant to the RSA, the Company's existing ABL lenders, White Oak ABL 3, LLC and White Oak Europe ABL Limited (collectively, the "Prepetition ABL Lenders"), and the Ad Hoc Group have agreed to support a chapter 11 plan of reorganization (the "Plan") and, in the case of the members of the Ad Hoc Group, to vote in favor of the Plan. Not only will the restructuring transactions contemplated by the RSA (the "Restructuring

Transactions") and embodied in the Plan deleverage the Company, but they will also provide adequate liquidity upon emergence through an upsized asset-based loan facility provided by the Prepetition ABL Lenders (the "Exit ABL Facility").  Critically, all general unsecured creditors, including the Company's key trade vendors, are unimpaired under the Plan.

8.     To fund these chapter 11 cases and instill confidence in the Company's customers, vendors, and other key stakeholders, the Company negotiated a debtor-in-possession financing package with the Prepetition ABL Lenders, which will provide the Company access to a $125 million asset-based revolving loan facility on terms substantially consistent with the Prepetition ABL Facility.  Through the Restructuring Transactions, Nine will emerge from these chapter 11 cases healthier and having instilled renewed confidence in key customers, vendors, and other stakeholders that are critical to the Company's long-term operational goals.

9.     Given the high level of consensus for the Restructuring Transactions and the need to limit the cost and disruption of these chapter 11 cases, the Company intends to proceed through these cases quickly and efficiently.  The agreement of the Company's key constituencies to advance these chapter 11 cases expeditiously is memorialized by various milestones in the RSA and the DIP Credit Agreement (as defined in the Plan).  To meet those milestones and minimize the effect of the chapter 11 cases on the Company and its businesses, the Debtors successfully launched solicitation prior to the commencement the chapter 11 cases.  On February 1, 2026, the Debtors commenced service of the solicitation materials (the "Solicitation Materials"), including the Disclosure Statement, the Plan, the various exhibits to those documents, and a ballot to vote to accept or reject the Plan, pursuant to sections 1125 and 1126(b) of the Bankruptcy Code on holders of Senior Secured Notes entitled to vote on the Plan.  The Debtors required that such holders submit their ballots by March 2, 2026 (the "Voting Deadline").  And though solicitation remains

ongoing, the Consenting Noteholders who hold more than 70% of the claims in Class 4 of the Plan—the only voting class—have committed to vote in favor of the Plan through the RSA.

10.    Now the Debtors are seeking entry of a scheduling order establishing a hearing to approve the Disclosure Statement and confirm the Plan (each as defined in the RSA) 31 days after the Petition Date and emergence the following day, or as soon as practicable thereafter.

11.    The Restructuring Transactions will preserve over 1,000 jobs and maximize the value of the Company for the benefit of all stakeholders.  With a deleveraged balance sheet and access to additional liquidity through the Exit ABL Facility, Nine is best positioned to continue to build on over a decade of providing the highest quality and most advanced completion services in the industry.

## **Background**

12.    I am the Executive Vice President and Chief Financial Officer of Nine.  I joined Nine in March 2019 as Vice President, Strategic Development.  In March 2020, I assumed the role of Chief Financial Officer and have served in that role since that time.  Prior to joining Nine, I was a member of J.P. Morgan's Investment Banking Group from 2007 to 2019, where I worked primarily on mergers and acquisitions and capital raisings for companies in the oil and gas industry and other related industries.  I hold a Bachelor of Arts in Mathematical Economic Analysis from Rice University.

13.    As Chief Financial Officer, I am responsible for overseeing Nine's financial activities, including, but not limited to, accounting, investor relations, financial planning, tax, information technology, and related activities.  I am familiar with Nine's business, financial condition, policies and procedures, day-to-day operations, and books and records.

14.    Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon my personal knowledge of the matters set forth herein or from

knowledge I have gained of such matters from Nine's employees or retained advisors that report to me in the ordinary course of my responsibilities.  I am over the age of 18 and am authorized by each of the Debtors to submit this Declaration on behalf of the Debtors.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

15.    On February 1, 2026 (the "Petition Date"), the Debtors commenced filing voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances leading up to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions.

16.    To familiarize the Court with Nine, its business, and the circumstances leading up to these chapter 11 cases, I have organized this Declaration into four parts:

- **Part I** provides background information on Nine's corporate history and operations;

- **Part II** offers an overview of Nine's prepetition corporate and capital structure;

- **Part III** describes the circumstances leading up to the filing of these chapter 11 cases and an overview of the anticipated path forward; and

- **Part IV** provides support for the relief requested in the First Day Motions.

## I.    The Company's History and Operations.

### A.    Corporate History.

17.    Nine's corporate history is defined by organic growth, strong customer development, and, as with many other OFS companies, adapting to changing industry landscapes

through strategic and well-timed acquisitions.  This business model has resulted in an intentional and comprehensive slate of well completion services and products.

18.    ***Formation and Expansion.***  The Company was formed in 2013 through a merger of three energy service companies owned by SCF Partners, L.P. and its affiliates (collectively, "<u>SCF Partners, L.P.</u>"):  Northern States Completions ("<u>Northern States</u>"), Integrated Production Services (Canada) ("<u>IPS</u>"), and CDK Perforating (US) ("<u>CDK</u>").  Northern States offered downhole completion tool solutions, whereas IPS and CDK were targeted wireline businesses.  Soon after the merger, the Company acquired Peak Pressure Control, which further expanded its portfolio into pressure control services.

19.    From the start, an entrepreneurial management team with proven industry experience and innovative technological solutions guided the Company and orchestrated various strategic transactions.  The Company expanded its offering into cementing operations in 2014 by acquiring Crest Pumping Technologies, a premier provider of downhole cementing services.  The Company also bolstered its wireline business by acquiring Dak-Tana Wireline.  The Company then acquired G8 Oil Tool—a completion tools business—in 2015 and consummated a merger with Beckman Production Services, Inc. ("<u>Beckman</u>") in 2017.  Although the Company ultimately divested from certain Beckman-related business segments in 2019, the Company's merger with Beckman, another of SCF Partners, L.P.'s portfolio companies, expanded the Company's operations into the coiled tubing segment.  Each of these transactions had a hand in shaping Nine by adding scale, strategically expanding the geographic footprint of the Company, and broadening the Company's completion technology and service offerings for customers.

20.    In January 2018, after years of developing the Company into a diverse OFS enterprise, Nine Energy Service launched its initial public offering (the "<u>IPO</u>") with J.P. Morgan

Securities LLC, Goldman Sachs & Co. LLC, and Wells Fargo Securities, LLC acting as joint book-running managers and representatives of the underwriters. The IPO raised approximately $169.5 million in net proceeds, which allowed Nine Energy Service to commence operations as a public company, repay then-existing financing facilities, expand its customer relationships, and further expand its service offerings. Nine Energy Service began trading on the NYSE under the symbol "NINE."

21.     As it did prior to the IPO, Company leadership continued to hone Nine's service offerings, including through the following transactions, which adjusted, optimized, and developed the Company's suite of products and services:

- **October 1, 2018**: acquisition of Frac Technology AS, a Norwegian private limited liability company that focuses on the development of downhole technology, which added the innovative BreakThru Casing Flotation Device to the Company's technology portfolio;

- **October 25, 2018**: acquisition of all the equity interests of Magnum Oil Tools International, LTD, and certain of its affiliates (collectively, "Magnum" and such transaction, the "Magnum Acquisition"), which augmented the Company's completion tools segment by unlocking Magnum's suite of proprietary downhole completions consumables products, including specialized components such as frac plugs, disk subs, and other bespoke parts; and

- **August 30, 2019**: divestiture of the Company's production solutions segment via the sale of its interests in its wholly owned subsidiary, Beckman Holding Production Services, LLC, which trimmed operations and provided the Company with $17.1 million in cash.

The acquisitions, as set forth in the below timeline, have created an array of high-quality solutions and technology to prepare horizontal, multistage wells.



22.     Nine's continued development has grown the Company to approximately 1,100 full-time individuals across the United States, Canada, and Norway, operating through four main business segments:  (1) Completion Tools; (2) Cementing; (3) Coiled Tubing; and (4) Wireline, as described below.

**B.     The Company's Business and Operations.**

23.     Onshore wells are complicated operations involving various stages, components, and technologies.   The Company's interrelated business segments are designed to meet

the specialized and differentiated needs of the well establishment, most of which take place in the completion phase of the well.



Revenue by service line (2025 estimate)

- Cementing 38%
- Coil Tubing 18%
- Wireline 21%
- Tools 23%

24.     ***Cementing.***   The Company's Cementing business segment is built around sophisticated cement mixtures—commonly referred to in the industry as "slurries"—that contribute to well establishment and completion.  Once a well is drilled into the ground (creating a "wellbore"), technicians typically insert metal casing along the wellbore pathway.  A cement slurry is then pumped between the casing and the wellbore of the well to seal the metal casing in place and control fluid interaction between the wellbore and any collocated reservoirs.

25.     The appropriate consistency and type of cement slurry is determined by the relevant geological conditions and well construction parameters, which are critical to a well's production.  Cement slurries require customized mixtures and are developed for a range of well depths, temperatures, pressures, and formation characteristics.  As such, the Company develops and



provides various cement slurries—and supporting materials and technologies—to ensure the highest quality sealing between the metal casing and wellbore and minimize environmental impact.  The Company

11

operates four laboratory facilities capable of designing and testing cement designs and cement additives.  The facilities operate twenty-four hours a day and employ qualified technicians who design substances with appropriate thickening times, compressive strengths, and fluid loss controls.  Nine's Cementing teams have deep expertise in North America's most active environments and deploy cutting-edge technology to customer operations.

26.     The Company's cementing business also involves delivery of cement mixtures to well sites, which is achieved through customized cementing units.  To ensure that cement slurries are delivered downhole on schedule, Nine's cutting-edge cement delivery vehicles are fully redundant.  This means that every vehicle contains two of each critical mechanism (pumps, hydraulics) to mitigate downtime due to mechanical failures and eliminate the need for spending resources on additional cementing standby units.

27.     The Company's Cementing segment is its largest line of business by revenue, generating approximately $213 million (approximately 37% of the Company's revenue) in the twelve months ending September 2025.  From January 2018 to September 2025, the Company completed approximately 29,000 cementing jobs.

28.     ***Wireline Services.***  Once the infrastructure of a well is established, well operators must use wire-controlled devices to deliver technology into the wellbore and conduct various activities, namely plug-and-perf completions. Though a variety of technologies and approaches exist, plug-and-perf operations generally involve using a wireline unit to deploy a perforating "gun" into oil and gas wells.  The perforating gun delivers explosives into the wellbore that fracture the surrounding formation and unlock resources.  Wireline systems can also be used for several other



purposes, including to convey tools into wellbores for well completion, well intervention, or pipe recovery processes.  Wireline systems are customized to a well's particular characteristics and can involve different systems and technologies.  The Wireline segment accounted for approximately 21% of the Company's revenue in the twelve-month period ending September 2025.

29.     ***Coiled Tubing.***  After a well is drilled, metal tubing in the form of continuous steel piping is inserted into a wellbore, allowing operators to deploy tools and fluids into the well. Coiled tubing is used for, among other things, drilling, removing obstructions and creating a path



for operations through milling, and retrieving objects stuck or lost in the wellbore.  This tubing is delivered to the well site on large spools of piping that can be tens of thousands of feet long and is deployed using specialized equipment. The Company's sophisticated coiled tubing units also carry data acquisition and dissemination technology, which allows the customer to monitor job progress through a web interface. Nine's "extended reach" coiled tubing units provide exceptional flexibility even in the most challenging downhole environments and can reach the end (or the "toe") of horizontal wells with total measured depths of 27,000 feet and beyond.  As with more common forms of metal tubing, coiled tubing comes in a variety of diameters to suit customer needs.  From January 2018 to December 2024, the Company performed approximately 8,300 jobs and deployed more than 218 million feet of coiled tubing, with a success rate of over 99%.  The Company's Coiled Tubing segment generated approximately 18% of the Company's revenue during the twelve-month period ending September 2025.

30.     ***Completion Tools.***  Complementary to its service offerings, the Company has developed a suite of proprietary tools used throughout the well completion process.  After a well

13



is drilled, metal tubing is installed, and cement is poured, a well operator must take various steps to "complete" the well and start the flow of resources. The completion process is complex and varies from one well to the next, but it often involves separating the well into discrete segments or stages using "well plugs" (often called "frac plugs") so that plug and perforation operations (commonly abbreviated as "plug-and-perf" operations) can commence. Plug-and-perf operations are sophisticated and multi-staged but generally involve the use of targeted explosive devices to fracture the geography and unlock oil and gas resources locked within the sediment. The Company supplies a variety of completion tools to assist with these processes, including composite, hybrid, and dissolvable frac plugs in several different sizes, and offers a selection of other completion tool products, such as liner hangers and accessories, fracture isolation packers, frac sleeves, and other specialized products unique to the world of onshore well development. The Completion Tools segment serves customers across the United States and Canada, and Nine's management estimates that, in 2024, Nine held approximately 15-25% of the domestic plug market share. During the last twelve months ending September 2025, the Completion Tools segment accounted for approximately 24% of the Company's total revenue.

31.   ***Research and Development.***   The Company progresses various research and development undertakings to ensure that it offers the most efficient and cost-effective products in the oil and gas marketplace. The Company dedicates resources annually to develop new technologies and equipment and to evolve and improve existing proprietary tools, including

through mergers and acquisitions, as needed.  One example is the Company's 2018 acquisition of Frac Technology AS, a Norwegian entity that owns the Breakthru Casing Flotation Device, discussed further herein, among other intellectual property.

32.     The Company also tasks personnel with sourcing and commercializing new technologies through strategic partnerships.  In connection with its research and development efforts, the Company has developed partnerships that provide it with exclusive rights to market and sell technology that is  unavailable to any other service providers in certain designated regions, which allows the Company to sell technology directly to customers and order from the manufacturers on an as-needed basis (with no minimum volume requirements).  Such partnerships provide the Company and its customers with access to unique technology from independent innovators and allow the Company to minimize its exposure to potential technology adoption and execution risks. The Company's existing partnerships also mitigate cost exposure ordinarily associated with the need to develop and research all products internally.

## II.     The Company's Prepetition Corporate and Capital Structure.

### A.     The Company's Corporate Structure.

33.     Nine Energy Service has eleven wholly owned subsidiary entities, nine of which are Debtors in these chapter 11 cases.  The Company's corporate structure includes entities incorporated in three countries—the United States, Canada, and Norway.  An overview of the Company's organizational structure is depicted below:



**B.**      **The Company's Capital Structure.**

34.      As of the Petition Date, the Debtors have approximately $388.0 million in total funded debt obligations.  The relative amounts and priorities of each funded debt obligation are as follows:

| Funded Debt | Maturity | Amount Outstanding (in millions) |
|---|---|---|
| Prepetition ABL Facility | November 2, 2027 | $68.5[3] |
| Senior Secured Notes | February 1, 2028 | $319.5[4] |
| Total Debt Obligations | | $388.0 |

---

[3]      Includes approximately $1.7 million in letters of credit.

[4]      Includes approximately $19.5 million in accrued interest.

i.      **Prepetition ABL Facility.**

35.      On May 1, 2025, Nine Energy Service and certain other Debtors entered into that certain Loan and Security Agreement (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement"), by and among White Oak Commercial Finance, LLC, as Agent (as defined therein) and lead arranger (the "Prepetition ABL Agent"), and the Prepetition ABL Lenders, as the lenders thereunder.   The Prepetition ABL Credit Agreement allowed the Debtors to access up to $125 million in asset-based, revolving credit loans (the "Prepetition ABL Facility"), subject to borrowing base calculations as provided therein.

36.      The Prepetition ABL Facility and the Senior Secured Notes (as defined herein) are secured by crossing liens on the Debtors' assets, as fully described in that certain Intercreditor Agreement, dated as of January 30, 2023, by and among, *inter alios*, the Prepetition ABL Agent, the Senior Secured Notes Trustee (as defined herein), and certain of the Debtors (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Crossing Liens Intercreditor Agreement").   The Prepetition ABL Facility is secured by a first-priority security interest in substantially all assets of Nine Energy Service and its U.S. and Canadian subsidiaries, subject to the first-priority liens granted in favor of the Senior Secured Noteholders in Notes Priority Collateral, which includes all Notes Collateral other than ABL Priority Collateral (each as defined in the Crossing Liens Intercreditor Agreement).   ABL Priority Collateral includes, among other collateral and exclusions described in the Crossing Liens Intercreditor Agreement, all Accounts, Inventory, Controlled Accounts, Chattel Paper, Documents, Instruments, and all General Intangibles (other than equity interests in subsidiaries of the Debtors and intellectual property of the Debtors, which constitute Notes Priority Collateral) (the foregoing capitalized terms which are used herein but not defined have the meanings ascribed

to thereto in the Crossing Liens Intercreditor Agreement or Prepetition ABL Credit Agreement, as applicable). The maturity date for the Prepetition ABL Facility is the earlier of (a) May 1, 2028, and (b) the date that 91 days prior to the maturity of the Senior Secured Notes. The Prepetition ABL Facility bears interest at a rate per annum ranging from SOFR + 4.00% to SOFR + 4.50%, based on the then applicable Fixed Charge Coverage Ratio (as defined in the Prepetition ABL Credit Agreement). As of the Petition Date, an aggregate amount of approximately $68.5 million is outstanding under the Prepetition ABL Facility. The Prepetition ABL Facility replaced the Company's prior ABL facility, the 2018 ABL Credit Facility.[5]

### ii.  Senior Secured Notes.

37.     On January 30, 2023, Nine Energy Service and certain other Debtors entered into that certain indenture (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Senior Secured Notes Indenture"), by and among: (a) Nine Energy Service, as issuer; (b) certain of its subsidiaries pursuant to the 2028 Senior Secured Notes Indenture, as guarantors; and (c) U.S. Bank Trust Company, National Association, as trustee, collateral agent, paying agent, and registrar (in such capacities, collectively, the "Senior Secured Notes Trustee"). The Senior Secured Notes Indenture provided for the issuance of $300 million aggregate principal amount of 13.000% Senior Secured Notes due 2028 (the "Senior Secured Notes" and the holders of the Senior Secured Notes, the "Senior Secured Noteholders"). The Senior Secured Notes are secured by a first-priority security interest in substantially all assets of Nine Energy Service and its U.S. subsidiaries, subject to the first-priority liens granted in favor of the Prepetition ABL Agent in ABL Priority Collateral

---

[5]     On October 25, 2018, the Company entered into an asset-based loan provided by a syndicate of lenders (the "2018 ABL Credit Facility"). On May 1, 2025, the Company entered into the Prepetition ABL Credit Agreement, fully repaid borrowings outstanding under the 2018 ABL facility, and terminated it contemporaneously therewith.

(as defined in the Crossing Liens Intercreditor Agreement).  As of the Petition Date, the Senior Secured Notes will mature on February 1, 2028, and accrue interest at a rate per annum equal to 13.000% cash payable on February 1 and August 1 of each year.  As of the Petition Date, an aggregate amount of approximately $319.5 million is outstanding under the Senior Secured Notes.

### C.     Letters of Credit.

38.     The Company also maintains three letters of credit totaling approximately $2.7 million.  One letter of credit secures the Company's obligations to WEX, Inc., administrator of the Company's fuel card program for employee travel between work sites (the "Wex LC"). The Company renews the Wex LC annually.  The Wex LC is scheduled to automatically renew in June 2026.  Separately, the Company is subject to two letters of credit in connection with certain ongoing litigation.[6]  On April 18, 2020, the Company was named a defendant in a patent infringement lawsuit involving its Breakthru Casing Flotation Device and, on January 18, 2022, received an adverse judgment in that matter.  The Debtors posted a $775,000 supersedeas bond (the "Bond") in connection with the litigation, which is secured by a letter of credit issued by JPMorgan Chase Bank, N.A., to Trisura Insurance Company, the insurance company that funded the bond on behalf of the Debtors.  The posting of the Bond allowed the Company to appeal the adverse judgment.  Wells Fargo has also issued a separate letter of credit (the "Wells Fargo LC") which covers, among other things, supplemental damages, ongoing royalties, and interest ordered by the trial court judge in connection with the litigation.  The total outstanding amount for the

---

[6]     For a more fulsome description of the Company's letters of credit, please refer to the *Debtors' Emergency Motion for Entry of An Order (I) Authorizing the Debtors to (a) Maintain Insurance Covered Entered into Prepetition and Satisfy Prepetition Obligations Related thereto, (b) Renew, Amend, Supplement, Extend, Purchase, and Enter into New Insurance Policies, (c) Honor Prepetition Payment Arrangements, (d) Continue to Pay Broker Fees, and (e) Maintain the Surety Bond and the Letters of Credit and (II) Granting Related Relief* filed contemporaneously herewith.

letters of credit securing the Bond and the Wells Fargo LC is approximately $2.44 million. The appeal remains pending.

        **D.**      **Nine Energy Service Equity.**

     39.     Nine Energy Service is publicly traded, and shares of Nine Energy Service's common stock, par value $0.01 per share ("Common Stock"), trade on the NYSE under the symbol "NINE."  The Company's certificate of incorporation authorizes the Company's board of directors to issue 120 million shares of Common Stock.  As of the Petition Date, approximately 43,326,339 shares of Common Stock were outstanding.

     40.     On October 21, 2024, Nine Energy Service received notice from the NYSE that it no longer satisfied the NYSE continued listing standards because its average global market capitalization was less than $50 million over a consecutive 30 trading-day period and, at the same time, its last reported stockholders' equity was less than $50 million.  On April 30, 2025, Nine Energy Service received another notice from the NYSE that it no longer satisfied the NYSE continued listing standards because the average closing share price of its Common Stock was less than $1.00 over a consecutive 30 trading-day period.  If Nine Energy Service does not regain compliance with the NYSE continued listing standards, the NYSE may initiate proceedings to delist its common stock.  As of the Petition Date, Nine Energy Service is still not in compliance with the NYSE continued listing standards but continues to actively work towards compliance.

**III.**    **Events Leading to These Chapter 11 Cases and the Anticipated Path Forward.**

        **A.**      **Prepetition Challenges.**

     41.     The Company commenced these chapter 11 cases primarily to address two related prepetition challenges: *first*, the Company's over-leveraged balance sheet, which has constrained liquidity and limited operational flexibility; and *second*, industry headwinds, which have tightened already slim margins.

i.      **Ongoing Liquidity Constraints Amidst Industry Headwinds.**

42.     Nine has consistently sought to stay abreast of technological advances to remain competitive in the OFS industry.  To accomplish that goal, Nine has dedicated resources focused on research and development; at the same time, it has sought out ideal partnership and mergers opportunities.  One major transaction occurred in 2018, when Nine acquired a company critical to its long-term outlook:  Magnum Oil Tools International, LTD.  At the time of the Magnum Acquisition, Magnum was a market-leading completions technology provider serving the global oil and gas industry.  Magnum held a slate of valuable, proprietary well technologies, including key components for establishing and completing onshore wells.  This suite of products made it an attractive target, presenting an opportunity for the Company to develop its Completion Tools segment and capture additional market share.

43.     The Company financed the Magnum Acquisition with additional funded debt and, given market events since the acquisition, has faced difficulties servicing those debt obligations. Specifically, the Company issued $400 million in aggregate principal amount of 8.750% senior unsecured notes due 2023 (the "2023 Notes") to fund the upfront cash purchase price of the Magnum Acquisition.  The remaining proceeds of the 2023 Notes, together with cash on hand and borrowings under the 2018 ABL Credit Facility, were used to fully repay and terminate the Company's then-existing credit facilities.   While the Company has since refinanced the 2023 Notes through the Senior Secured Notes, the indebtedness issues originating from the Magnum Acquisition were never entirely resolved and continue to weigh on the Company's balance sheet today.

44.     Shortly after the Magnum Acquisition, a myriad of industry headwinds challenged the Company's operations and amplified the effect of its over-leveraged balance sheet. Chief among such headwinds was the COVID-19 pandemic, which triggered a stark decline in

demand for oil and other energy resources as international travel fell to record lows. Oil and gas market activity levels decreased by 50% during the COVID-19 period, causing pricing pressures that, in turn, decreased the Company's revenue, quickly strained liquidity, and exacerbated the effects of the Company's newly increased funded debt obligations.

45.     The Company has faced additional industry-specific headwinds. Energy prices, for example, have remained stubbornly volatile. The Company's profitability, like many oil and gas businesses, depends in large part on resource development activities and corresponding capital spending of oil and natural gas companies. When energy prices shift abruptly, it creates a challenging market environment for the Company and similarly situated businesses. Pricing trends in the last several years reflect this: the first quarter of 2021, for example, oil and natural gas prices began to rebound from the COVID-19 trough, steadily increasing throughout 2021 and remaining supportive into 2022. Oil prices reached a 13-year high in March 2022, primarily as a result of the conflict between Russia and Ukraine igniting fears of shortages. In late 2022, however, due to the rise in interest rates, economic uncertainty, and fears of recession, oil prices began to decline once again. The Company felt the effects of the market volatility but, through the efforts of its experienced management team and employees, avoided a disruptive restructuring process.

46.     The oil and gas industry's persistent volatility still created financial uncertainty for the Company and hindered its ability to meaningfully strategize for both short-term and long-term development. In light of these challenges, value derived from the Magnum Acquisition could not outpace the industry-wide challenges the Company experienced. At the same time, cash interest payments for the 2023 Notes came due twice each year, forcing the Company to consistently absorb material interest expenses and expend a considerable amount of its available liquidity.

The below chart illustrates the Company's significant interest expense over the last several years.



Note: Interest increase in Q4'18 driven by debt financing associated with Magnum Acquisition.

47.     Finally, worsening capital markets rendered the Company unable to lessen the negative effect of its debt through an out-of-court refinancing.  As the maturity date for the 2023 Notes neared, the Company began exploring options to refinance its existing funded debt.  Market conditions, however, limited the Company's options and lenders demanded more expensive borrowing terms.  As a result of the impending maturity for the 2023 Notes and the Company's diminished liquidity position, the Company was forced to refinance the maturing unsecured 2023 Notes through a transaction that both added to the Company's secured debt and increased the interest rate of the Company's semiannual payments.

48.     In January 2023, the Company (i) issued the Senior Secured Notes to fund the redemption of the 2023 Notes, and (ii) amended the 2018 ABL Credit Facility to, among other things, extend the maturity date thereof and facilitate the issuance of the Senior Secured Notes.  While the Senior Secured Notes and amended 2018 ABL Credit Facility enhanced the Company's liquidity position and provided the Company with additional runway to analyze and develop long-term solutions, they were expensive debt facilities that continued to burden the Company's balance sheet.

49.     The Company explored various options for reducing its leverage, including by further refinancing and replacing the 2018 ABL Credit Facility via the Prepetition ABL Facility

on May 1, 2025; however, the industry and capital markets remain challenging.  In 2024, natural gas price averages fell again, this time by over 60% compared to 2022 prices.  Oil prices also continued to fall towards the end of 2024, and the imposition of additional tariffs in April 2025 led to increased costs for critical raw materials such as steel, aluminum, and other manufactured components, which created further headwinds for the energy industry.  The combination of the Company's recent 2023 and 2025 refinancing transactions, stubbornly high interest rates, and market activity demanding more strenuous terms have rendered a regular-way deleveraging transaction untenable.  Meanwhile, oil prices and customer demand are both projected to remain stagnant in 2026, minimizing opportunity for additional organic liquidity.  The result of these two distinct yet interrelated conditions means out-of-court deleveraging options are impracticable, forcing the Company to remain stagnant in an unpredictable market—an unworkable outcome.

ii.     **Limitations on Strategic Alternatives.**

50.     Alongside macroeconomic challenges and an overleveraged balance sheet, several other industry developments caused additional economic hardship.  The most harmful of these is industry consolidation.  Operational efficiencies in the oil and gas industry are often generated through strategic mergers and acquisitions.  Oil and gas businesses, including service providers in the energy industry, commonly gain market leverage by increasing the scale of operations and, subsequently, attracting more investors and customers.  These transactions evolve the energy industry landscape, and demand constant adaptation for companies in the industry to remain competitive.

51.     As the Company struggled to keep up with its debt service, the oil and gas industry experienced significant consolidation and technological advancement, especially with respect to the Company's customer base.  This trend towards larger, centralized well development companies that utilize fewer, more technically complex wells limited the number of potential customers and

mandates.  For example, the number of rigs operating in the Haynesville basin declined by 30% between 2023 and 2024 alone.  Many oil and gas companies, often in response to their own declining profit margins and continued market volatility, have successfully restructured to reduce their respective leverage profiles towards leaner, nimbler operations better suited to current market environments.  The Company, by comparison, remains at a competitive disadvantage.

52.     Additionally, investors and market participants began to view North American oil and gas production with increased skepticism, often assigning flat or otherwise less optimistic outlooks to pricing and production.  This further contributed to a reduction in the establishment and deployment of oil rigs, which precipitated a reduction in the number of wells being developed. As a result, there were fewer opportunities to offer well completion services.



53.     These factors have constrained the Company's ability to out-grow or out-perform its balance sheet challenges.  Nonetheless, the Company's business, which requires little capital, is in a strong position to succeed if it can lighten its debt.  The Company realized that, without an

in-court transaction, revenue would continue to decline while funded debt obligations simultaneously drained any generated liquidity.

### B. Prepetition Initiatives and the Path Forward in Chapter 11.

#### i. Engagement with Stakeholders.

54. Against the backdrop of challenging market conditions and the high-interest rate environment, the Company determined that approaching its existing stakeholders for a much-needed deleveraging transaction was necessary to best position the Company for future growth. As a first step in that process, the Company sought external advice and assistance in October 2025, engaging Moelis & Company LLC ("Moelis") as investment banker to explore strategic alternatives. The Company also turned to Kirkland & Ellis LLP ("Kirkland") to help lead negotiations with the Company's stakeholders and commence contingency preparations for a variety of potential transactions. As the Company continued to evaluate its options, it hired FTI Consulting, Inc. ("FTI") as financial advisor.

55. After retaining Moelis and Kirkland, the Debtors contacted potential advisors to the Senior Secured Noteholders and asked them to aggregate a group of significant holders. A group of four Senior Secured Noteholders engaged the Ad Hoc Group Advisors in November 2025 and formed the Ad Hoc Group shortly thereafter. The Debtors, with the assistance of their advisors, began discussions with the Ad Hoc Group and other key stakeholders and continued evaluating paths forward.

56. Discussions progressed, and in late December the Company worked with Moelis and Kirkland to execute non-disclosure agreements with the members of the Ad Hoc Group. The Ad Hoc Group Advisors were also given access to a virtual data room so the Ad Hoc Group could diligence the Company's business and potentially engage in strategic transaction negotiations, especially given the upcoming $19.5 million interest payment due February 1, 2026.

57.     Over the course of December and January, the Company and the Ad Hoc Group traded multiple term sheets and made progress on transaction specifics.  The Company and its advisors also held numerous diligence calls and satisfied the Ad Hoc Group Advisors' diligence requests expeditiously.  In parallel, the Company continued to communicate with the Prepetition ABL Lenders, who were aware of the Company's liquidity situation and the fact that the Company was in discussions with the Ad Hoc Group.  Negotiations remained productive as the Ad Hoc Group reviewed detailed diligence and came to understand the Debtors' operations, liquidity needs, assets, and contractual relationships.

58.     Ultimately, the Company, with the assistance of its advisors, determined that its best and only option was to deleverage its balance sheet through a chapter 11 process in advance of the impending interest payment on the Senior Secured Notes.  Transaction details solidified, and the Company and the Prepetition ABL Lenders also engaged in arm's-length negotiations on the terms of debtor-in-possession financing to provide a replacement asset-based loan facility that would roll into an exit asset-based loan facility, each to be provided by the Prepetition ABL Lenders.  As described in more detail herein, the Debtors, with assistance of Moelis, also engaged in a third-party DIP financing marketing process.  That process yielded two additional bids, but after negotiation on terms, it became clear that those bids were either not actionable or inferior to the DIP financing offered by the Prepetition ABL Lenders.

### ii.     Restructuring Support Agreement.[7]

59.     The Company's negotiations with its key financial stakeholders culminated in execution of the RSA on February 1, 2026.  The decision to enter into the RSA and commence

---

[7]     Capitalized terms used but not otherwise defined in this section have the meaning ascribed to them in the RSA or the Plan.

these chapter 11 cases was based on months of strategic review and regular discussions amongst the Company's board of directors (the "Board"). The Board determined, after extensive discussions with Moelis, Kirkland, and FTI, that the RSA and these chapter 11 cases represent the most value-maximizing path forward for the Company. To that end, the Board authorized entry into the RSA and commencement of these chapter 11 cases.

60. The Restructuring Transactions outlined in the RSA are supported by the Ad Hoc Group—*i.e.*, Senior Secured Noteholders holding more than 70% of the Senior Secured Notes and the Prepetition ABL Lenders, both of which are signatories to the RSA. The Restructuring Transactions and the commitments for debtor-in-possession financing, which include $125 million in committed revolving credit availability (the "DIP Facility"), will support the Company's operations during chapter 11 and ensure a smooth and timely exit from chapter 11.

61. The RSA contemplates the following:

- the Prepetition ABL Lenders will provide a senior secured superpriority asset-based DIP Facility with an aggregate principal commitment of $125 million on the terms set forth in the DIP Documents. The DIP Facility shall be used for (i) working capital and corporate purposes of the Debtors, (ii) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases, (iii) costs and expenses related to the DIP Facility, and (iv) refinancing all obligations under the Prepetition ABL Facility;

- on the Effective Date, the DIP Facility shall convert into the Exit ABL Facility with an aggregate principal commitment of $135 million and secured by a first lien security interest on substantially all assets of the Debtors, as reorganized pursuant to the Restructuring Transactions;

- each Holder of an Allowed Prepetition ABL Claim shall be paid in full in cash to the extent not converted into DIP Claims in accordance with the DIP Documents;

- each Holder of Senior Secured Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its *pro rata* share of 100% of the New Equity Interests, which shall be distributed ratably on account of the Allowed Senior Secured Notes Claims and subject to dilution by the Management Incentive Plan;

- General Unsecured Claims will be unimpaired; and

- on the Effective Date, the Nine Energy Equity Interests shall be cancelled, released, discharged, extinguished, and of no further force or effect, and such holder shall not receive any distribution, property, or other value under the Plan on account of such Nine Energy Equity Interests.

62. The RSA contains the following milestones:

- no later than 11:59 p.m. (prevailing Eastern Time) on February 1, 2026, the Debtors shall have commenced solicitation of votes in favor of the Plan;

- no later than 11:59 p.m. (prevailing Eastern Time) on February 1, 2026, the Debtors shall have commenced the Chapter 11 Cases in the Bankruptcy Court;

- no later than one (1) day following the Petition Date, the Debtors shall have filed with the Bankruptcy Court:  (i) the First Day Pleadings; (ii) the Plan, the Disclosure Statement, the motion scheduling the Combined Hearing, and the Solicitation Materials; and (iii) the DIP Motion (including the proposed Interim DIP Order);

- no later than three (3) Business Days following the Petition Date, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than 11:59 p.m. (prevailing Eastern Time) on March 16, 2026, subject to Bankruptcy Court availability, the Bankruptcy Court shall have entered the Disclosure Statement Order, the Confirmation Order, and the Final DIP Order; and

- no later than 11:59 p.m. (prevailing Eastern Time) on March 31, 2026, the Plan Effective Date shall have occurred.

63. To limit business interruption and maximize the Company's ability to achieve its long-term operational and financial goals, it is critical that the Debtors move through these chapter 11 cases as efficiently as possible.

### iii. Investigation.

64. In December 2025, the Company, at the direction of the Company's independent director, Scott Schwinger (the "Independent Director"), engaged Kane Russell Coleman Logan PC ("Kane Russell") as independent counsel to assist in, among other things, conducting an

independent investigation (the "Investigation") into any and all potential estate claims and causes of action, including as against related parties of the Company arising from the Company's prepetition transactions.

65.     To assist with the Investigation, it is my understanding that the Independent Director instructed Kane Russell to conduct a thorough review of the Debtors' books and records, transactions, and actions taken prior to the Petition Date.  The Debtors provided the Independent Director with access to the Debtors' documents and personnel, and Kane Russell conducted interviews of the Debtors' current directors, officers, and employees, including myself and others on the management team.  It is my understanding that the Investigation concluded prior to the commencement of these chapter 11 cases.  The Debtors intend to provide additional information regarding the Investigation and evidentiary support for the Plan's various release and exculpation provisions prior to confirmation.

### iv.     The Proposed DIP Facility and Access to Cash Collateral.

66.     The Company seeks approval of a $125 million senior secured superpriority asset-based financing facility composed of (i) postpetition access to all of the commitments under the Prepetition ABL Facility, (ii) a "roll-up" or refinancing of all prepetition ABL obligations upon entry of the Interim DIP Order, and (iii) a $5 million sublimit for the issuance of standby letters of credit.  The Debtors will also have access to the cash collateral subject to a prepetition security interest in favor of the Prepetition ABL Lenders on a consensual basis, which is essential to the continued operation of the Debtors' business.  The DIP Facility is the best (and only) financing alternative available to the Debtors and the only financing the Debtors' secured lenders will support.  The DIP Facility also forms an integral component of the RSA.  To confirm that no other party was willing to provide junior debtor-in-possession financing or debtor-in-possession financing otherwise on better terms, in the weeks preceding the Petition Date, the Company, with

the assistance of Moelis, launched a targeted "market test" process to gauge third-party interest in providing debtor-in-possession financing. The Company contacted third parties that specialize in special situation direct lending to solicit interest in extending financing on the timeline and in the quantum required. In total, the Company contacted 25 parties and 15 executed confidentiality agreements. In response, the Debtors received two additional DIP proposals to refinance the prepetition ABL obligations, and the Debtors closely engaged those parties to gauge the potential for securing better terms for chapter 11 financing. Ultimately, no alternative third-party financing was offered on better terms than those proposed under the DIP Facility.[8]

67.     The DIP Facility is essential to the Debtors' ability to continue operations and administer these chapter 11 cases and are an integral component of the transaction. The nature of the DIP Facility was driven by the need to keep access to the Debtors' revolving credit facility, thereby allowing continued operation of the Debtors' business in the ordinary course and the incremental cost of administering these chapter 11 cases.

68.     The Debtors require immediate access to the additional liquidity provided through the DIP Facility. Based on the Debtors' forecast, the Debtors anticipate that absent the funds available from the DIP Facility, they will hit a liquidity shortfall in the first week of these chapter 11 cases and, consequently, would face a value-destructive interruption to their business and lose support from key customers, stakeholders, and vendors on whom the Debtors' business depends.

---

[8]     The process and engagement with the interested DIP parties is described in more detail in the *Declaration of Bassam J. Latif in Support of the Debtors'* <u>*Emergency*</u> *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed contemporaneously herewith.

69.     The commitments under the DIP Facility and RSA demonstrate that the Debtors have a path to exit on "day one" of these cases with the support of the DIP Lenders (as defined in the Plan) and the other RSA parties and provide the Debtors with a clear message to all stakeholders that the Debtors will be able to continue providing services to their customers in the ordinary course.  As discussed above, the timeline contemplated by the milestones contained in the RSA provide all parties with clear visibility into the timeline of these cases.

## IV.    Evidentiary Basis for Relief Requested in the First Day Motions.

70.     Contemporaneously herewith, the Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "First Day Motions").  The First Day Motions seek orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and ensure that the value of the Debtors' assets is maximized for the benefit of all stakeholders.  Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their business with minimal disruption and thereby preserving value for the Debtors' estates and various stakeholders.

71.     The First Day Motions request authority to pay certain prepetition claims.  I have been advised by counsel that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  I understand that the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims in light of this requirement.  I am generally familiar with the contents and substance of each First Day Motion, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought therein (a) is necessary to permit an effective transition into

chapter 11, (b) constitutes a critical element for the Debtors to successfully implement a chapter 11 strategy and is a sound exercise of business judgment, and (c) best serves the Debtors' estates and creditors' interests.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Motions.  The evidentiary support for the First Day Motions is set forth in **<u>Exhibit A</u>** attached hereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 1, 2026                   /s/ Guy Sirkes
                                           Guy Sirkes
                                           Executive Vice President & Chief Financial Officer
                                           Nine Energy Service, Inc.

## Exhibit A

**Evidentiary Support for First Day Motions**

## Evidentiary Support for First Day Motions[1]

1.     ***Joint Administration Motion***.  The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* seeks joint administration of the Debtors' cases for procedural purposes only, given the integrated nature of the Debtors' operations.  Joint administration of these chapter 11 cases for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.     ***156(c) Retention of Claims Agent***.  The *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* seeks authority to employ Epiq Corporate Restructuring, LLC ("Epiq") as the claims, noticing, and solicitation agent for these chapter 11 cases.  Epiq's employment is in the best interest of the estates in light of the number of parties in interest and the complexity of the Debtors' business, and it will provide the most efficient and effective means for noticing stakeholders, administering claims, and soliciting and tabulating votes on a chapter 11 plan.

3.     ***Consolidated Creditor Matrix Motion***.  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and a*

---

[1]     To the extent there is any conflict or inconsistency between the relief described herein and the relief requested in the applicable First Day Motion, the relief requested in the applicable First Day Motion shall govern.  Capitalized terms used but not defined in this Exhibit shall have the meanings ascribed to them in the applicable First Day Motion.

*Consolidated List of the 30 Largest Unsecured Creditors, (B) Redact or Withhold Certain Confidential Information of Customers, and (C) Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (IV) Granting Related Relief* seeks a Court order (a) authorizing the Debtors to (i) file a consolidated creditor matrix and a consolidated list of the Debtors' thirty (30) largest unsecured creditors, (ii) redact certain confidential information of customers, and (iii) redact certain personally identifiable information of natural persons; (b) waiving the requirement to file a list of, and provide notice directly to, certain equity security holders of Debtor Nine Energy Service, Inc.; and (c) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information.  Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors should be authorized to file one Consolidated Creditor Matrix for all Debtors.  Moreover, the requirements to file a list of, and to provide notice directly to, equity security holders should be waived as to Nine Energy.  With the exception of a small subset of registered equity security holders, the Common Stock holdings cannot be readily traced to specific individual holders.  Preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties would create undue expense and an administrative burden with limited corresponding benefit to the estates or parties in interest.

4.      Additionally, one of the Debtors' most critical assets is their Customer List.  If the Debtors were required to disclose the Customer List, the Debtors' business operations may be harmed by loss of customers to competitors, which could in turn negatively impact the Debtors' estates.  The redaction of the Customer List is appropriate to maintain existing customer

relationships and maximize the value of the Debtors' estates.  Furthermore, the redaction of certain personally identifiable information of individuals is necessary due to the privacy and safety concerns that would arise if such information were disclosed in the Debtors' Court filings and to help the Debtors comply with applicable privacy laws.  Approving the form and manner of the notice of commencement is necessary to avoid confusion among creditors as well as to prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix.

5. ***Wages & Benefits Motion.***  The *Debtors' <u>Emergency</u> Motion For Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* seeks entry of an order authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.  The Compensation and Benefits that the Debtors are seeking authority to pay and honor include, among other things, Wage Obligations, the Independent Contractor Obligations, the Staffing Agency Fees, the Non-Insider Bonus Programs, the Reimbursable Expenses, the Withholding Obligations, the Employer Payroll Taxes, the Payroll Processing Fees, the Health and Welfare Coverage and Benefits, the Workers' Compensation Program, the 401(k) Program, the Paid Leave Benefits, the Non-Insider Severance Benefits, the Other Benefits, and certain other compensation or benefits that the Debtors provide in the ordinary course. The Debtors employ approximately 1,070 full-time Employees across the United States and Canada.  In addition to the Employees, the Debtors have historically retained and will continue to retain a small number of individuals as independent contractors who provide consulting services

and temporary workers whom the Debtors source periodically from staffing agencies.  As of the Petition Date, the Debtors retain approximately 30 Independent Contractors and Temporary Workers.  The Employees, Independent Contractors, and Temporary Workers perform a wide variety of job functions that are critical to the Debtors' business operations and the administration of these chapter 11 cases, including design and engineering, health and safety oversight, sales, project management, supply chain management, shipping and trucking, specialized equipment operation and maintenance, and other manufacturing functions.

6.      The Employees' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  They possess unique skills and experience with respect to the Debtors' core business segments that, in many instances, cannot be easily replaced.  The Debtors believe that, absent timely payment of amounts owed to their Employees, the Debtors may experience employee turnover and instability at this critical time in these chapter 11 cases.  The Employees, along with the Independent Contractors and Temporary Workers, rely on their compensation and benefits to pay their daily living expenses and support their families.  The Employees will be exposed to significant financial hardship if the Court does not permit the Debtors to continue paying their wages and salaries and providing health and other benefits in the ordinary course during these chapter 11 cases.  Furthermore, the Debtors and their estates will also be harmed if they are unable to provide the Compensation and Benefits to their Employees consistent with past practice.  Without the continued, uninterrupted services of the Employees, Independent Contractors, and Temporary Workers, the Debtors' business operations would suffer immediate and irreparable harm, and their restructuring efforts would be materially impaired.  Accordingly, the relief requested is necessary and appropriate.

7.     **_Cash Management Motion_**.  The _Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (III) Granting Related Relief_ seeks interim and final Court orders (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts, including by honoring certain prepetition obligations related thereto, (ii) carry out Intercompany Transactions and funding consistent with the Debtors' historical practices, and (iii) maintain existing Business Forms and Books and Records; and (b) granting administrative expense status to the Intercompany Transactions among the Debtors and between the Debtors and their non-Debtor affiliates.

8.     In the ordinary course of business, the Debtors maintain their Cash Management System to collect, transfer, and disburse funds generated from operating their businesses. The Cash Management System facilitates Intercompany Transactions among various Debtors and between the Debtors and their non-Debtor affiliates to ensure that sufficient cash is available for each such entity.  The Company's treasury department maintains daily oversight over the Cash Management System by implementing cash management controls for accepting, processing, and releasing funds, including in connection with any Intercompany Transactions.

9.     Given the size, scale, and integrated nature of the Company's businesses, any disruption to the Cash Management System would have an immediate and materially adverse effect on the Debtors' operations and ability to transition smoothly into these chapter 11 cases, to the detriment of their estates and stakeholders.  Accordingly, to minimize disruption and maximize

the value of the Debtors' estates, the Debtors should be granted authority to continue operating their existing Cash Management System in the ordinary course of business and to pay any prepetition amounts related thereto that are owed as of the Petition Date.

10.     ***Customer Contracts Motion.***  The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor and Incur Obligations under Customer Contracts, (B) Obtain New Customer Contracts, and (C) Maintain and Administer their Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* seeks a Court order (a) authorizing, but not directing, the Debtors to (i) honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations incurred in relation to the Existing Customer Contracts, including Contract Adjustments, Operating Costs, Liquidated Damage Payments, Warranties, and Indemnifications, (ii) incur, honor, pay, or otherwise satisfy any and all prepetition and postpetition obligations related to attracting, seeking, entering into, and maintaining New Customer Contracts, including Contract Adjustments, Operating Costs, Liquidated Damage Payments, Warranties, and Indemnifications, and (iii) maintain and administer their Customer Programs and honor certain prepetition business practices related thereto on a postpetition basis in each case, in the ordinary course of business and consistent with past practice.

11.     The Debtors' revenue depends on their ability to attract and retain their Customers on the terms set forth in the Customer Contracts.  Further, harm to the Debtors' reputation resulting from an inability to perform under the Existing Customer Contracts would likely inhibit the Debtors' ability to attract and retain Customers and obtain new Customer Contracts.  The Debtors' ability to continue the Customer Programs and honor obligations thereunder is necessary to preserve material Customer relationships, respond to competitive market pressures, support revenue generation and continuity, and ultimately maximize value for the Debtors' estates.

Continuing the Customer Programs will enable the Debtors to maintain goodwill and enhance revenue and profitability for the benefit of all of the Debtors' key stakeholders. The Debtors believe that their ability to continue performing under the Existing Customer Contracts and to maintain the Customer Programs in the ordinary course of business is critical to preserving material customer relationships, complying with contractual obligations, and remaining competitive in the marketplace. Any interruption in performance under the Existing Customer Contracts, or the discontinuation of the Customer Programs, would likely result in lost revenue, threaten the Debtors' ability to maintain ordinary course operations and remain consistent with past practice, and impair the Debtors' ability to meet ongoing operational and liquidity requirements.

12. **All Trade Motion.** The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Trade Claims in the Ordinary Course of Business, (II) Confirming the Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "All Trade Motion") seeks interim and final Court orders (a) authorizing, but not directing, the Debtors to pay all Trade Claims in the ordinary course of business, and (b) confirming the administrative expense priority of Outstanding Orders and authorizing, but not directing, the Debtors to satisfy such Outstanding Orders in the ordinary course of business. As a highly specialized business, the Debtors' success depends on the uninterrupted flow of goods and services throughout their global supply chain and distribution network. To that end, the Debtors maintain a network of longstanding, productive relationships with the Trade Creditors, who provide the Debtors with, among other things: (a) parts and equipment required to operate the Debtors' various business segments, including goods and components such as cement, coil tubing strings, perforating gun systems, chemicals and additives

for cement mixtures, and well liners, among others, (b) services related to the use, repair and maintenance, and rental of critical equipment, including coil tubing units, wireline units, cranes, and other vehicles, (c) machining services, including for the Debtors' tools division, and (d) logistics and transportation services, including shipping and freight services. In addition to the categories described above, Trade Creditors also supply indispensable items such as safety equipment, product components, tools and tool parts, and other basic business necessities required for the operation of the Debtors' businesses.

13.     Consistent with the Plan's proposed treatment of Trade Creditors, the Debtors intend to pay Trade Claims as they come due in the ordinary course of business. The relief requested in the All Trade Motion is tailored to further the Debtors' restructuring goals and maximize the value of their estates by preserving operational efficiency and implementing the spirit of the RSA on the first day of these chapter 11 cases. Given the prepackaged nature of these chapter 11 cases, the unimpaired treatment of Trade Creditors under the Plan, and the importance of uninterrupted business operations, the Debtors believe that this relief is appropriate.

14.     Maintaining relationships with Trade Creditors and having the ability to pay them is critical to the Debtors' reorganization efforts. The Debtors cannot afford, and likely could not withstand, the severe disruption to their supply chain that would result from failing to pay Trade Claims on time. Any interruption to the Debtors' business at this critical juncture—however brief—could induce Trade Creditors to halt shipments, set off amounts owed, sever commercial relationships, or take other measures that will harm the Debtors' estates. Creditors also hold Trade Claims in Canada, and there is incremental risk when foreign Trade Creditors are involved, as such creditors may disregard the automatic stay and attempt to exercise remedies in non-U.S. jurisdictions.

15.     **Insurance Motion.**   The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, Purchase, and Enter into New Insurance Policies, (C) Honor Prepetition Payment Arrangements, (D) Continue to Pay Broker Fees, and (E) Maintain Any Surety Bonds and Letters of Credit and (II) Granting Related Relief* seeks a Court order authorizing the Debtors to (a) maintain insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (b) renew, amend, supplement, extend, purchase, and enter into insurance coverage on a postpetition basis in the ordinary course of business, (c) honor and renew the terms of the premium financing agreement entered into prepetition, satisfy obligations related thereto, and enter into new premium financing agreements in the ordinary course of business, (d) pay prepetition obligations on account of and continue to pay Broker Fees on a postpetition basis in the ordinary course of business, and (e) maintain, renew, modify, supplement, terminate, and replace any Surety Bonds and Letters of Credit.  The continuation and renewal of the Debtors' Insurance Policies, Surety Bonds, and Letters of Credit are essential to preserving the value of the Debtors' business and assets.

16.     **Taxes Motion**.   The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* seeks authority to negotiate, pay, and remit (or use tax credits to offset) or otherwise satisfy Taxes and Fees arising or accrued in the ordinary course of business that are payable or become payable during these chapter 11 cases, including any obligations arising on account of an Audit or Assessment, without regard to whether such obligations accrued or arose before, on, or after the Petition Date.  Failure to pay the Taxes and Fees (including any Assessments) as and when they

come due could materially disrupt the Debtors' business operations by increasing the Debtors' tax liability, causing Authorities to initiate Audits or pursue other remedies, and/or subjecting the Debtors' directors and officers to claims of personal liability, which would distract from the Debtors' restructuring efforts.  Further, claims on account of certain of the Taxes and Fees may be priority claims entitled to payment before general unsecured claims, and certain of those claims may be entitled to secured status.

17.     Additionally, the Taxes Motion seeks authority to engage in Tax Planning Activities as necessary on a postpetition basis.  The ability to engage in the Tax Planning Activities is necessary to provide the Debtors with the flexibility to take steps to minimize overall tax costs, which could include, among other things, state and local taxes associated with implementing any proposed chapter 11 plan and therefore enhance the value of the estates for their creditors.

18.     **Utilities Motion.**   The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* seeks entry of an order (a) determining that the Adequate Assurance Procedures (as defined herein) provide the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, and (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance.

19.     The uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases.  To successfully operate their

businesses, the Debtors must maintain the ability to run their cementing, coiled tubing, research and development, fabrication, and warehouse facilities in a near-constant state.  The Debtors' operations, facilities, and offices require a near-constant supply of electricity, water, natural gas, telecommunications, waste management (including sewer, trash and janitorial services), internet, and other similar services.  Any refusal, alteration, or disruption of Utility Services by a Utility Provider, even for a brief period, would severely disrupt the Debtors' business operations, and, as a result, potentially endanger the health and safety of the Debtors' employees or materially impair the Debtors' ability to successfully advance their reorganization efforts.  Any disruption of Utility Services would also materially impair the Debtors' revenue-generating and production capabilities to the detriment of all stakeholders in these chapter 11 cases.  Accordingly, the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.

20.   **NOL Motion.**   The *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock, (II) Directing Any Such Transfer or Declaration of Worthlessness in Violation of Such Procedure Be Null and Void Ab Initio, and (III) Granting Related Relief* seeks a Court order (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness, with respect to Debtor Nine Energy Service, Inc.'s existing class of common stock or any Beneficial Ownership therein and (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to the Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*.

21.     The Debtors estimate that, as of December 31, 2024 they had approximately $381 million of federal NOLs and approximately $104 million of 163(j) Carryforwards. The Debtors may generate substantial additional Tax Attributes in the current tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset federal taxable income or federal tax liability in future years, including any taxable income generated by transactions consummated during these chapter 11 cases.  The Procedures are intended to preserve the value of the Tax Attributes to the benefit of the Debtors' stakeholders by ensuring that there are no "ownership changes" that may negatively affect the Debtors' utilization of the Tax Attributes. Conversely, a premature limitation of the Debtors' Tax Attributes could cause substantial deterioration of value and significantly reduce recoveries to the Debtors' stakeholders.  Failure to obtain the relief sought in the motion could therefore greatly increase the risk that the Debtors would be unable to maximize the value of their estates.

22.     ***Disclosure Statement Scheduling Motion***.  The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan Voting Deadline, Opt-Out Deadline, and Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Waiving the Requirements for the U.S. Trustee to Convene a Meeting of Creditors, (VI) Waiving the Requirements for the Debtors to File (A) Schedules and SOFAs and (B) Rule 2015.3 Financial Reports, and (VII) Granting Related Relief* seeks a Court order (a) scheduling the Combined Hearing; (b) establishing the Voting Deadline, the Opt-Out Deadline, and the Objection Deadline and approving related procedures; (c) approving the form and manner of the Combined Hearing Notice, the Publication

Notice, and the Notice of Non-Voting Status (including the Opt-Out Form); (d) approving the Solicitation Procedures and the form and manner of the Ballots; (e) waiving the requirement to mail Solicitation Packages to the Non-Voting Classes; (f) allowing the notice period for the Disclosure Statement and the Combined Hearing to run simultaneously; (g) conditionally waiving the requirements that (i) the U.S. Trustee convene the Creditors' Meeting and (ii) the Debtors file Schedules, SOFAs, and 2015.3 Reports; and (i) granting related relief.  In connection with the foregoing, the Debtors are requesting that the Court approve the Confirmation Schedule, including a proposed hearing to approve the adequacy of the Disclosure Statement and confirm the Plan, subject to the Court's availability, to implement their restructuring transactions.  The relief requested will preserve estate resources and enable the Debtors to implement the Restructuring Transactions expeditiously and cost-effectively.